## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

LANCE COLLIK,                           :
                                        :
            Plaintiff,                   :      Case No. 3:20-cv-307
                                        :
      v.                                 :      Judge Thomas M. Rose
                                        :
KYLE E. POHLABEL, *et al.*,              :
                                        :
            Defendants.                  :

---

### ENTRY AND ORDER GRANTING DEFENDANT POHLABEL'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 24); DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 21); AND, TERMINATING THE CASE

---

This case involves a claim brought by Lance Collik ("Collik") against Ohio State Highway Patrol trooper Kyle E. Pohlabel ("Pohlabel") for deprivation of civil rights under 42 U.S.C. § 1983 arising from a traffic stop. (Doc. 1.) Pending before the Court are two motions: Plaintiff's Motion for Partial Summary Judgment (Doc. No. 21) ("Plaintiff's MSJ") and Defendant Pohlabel's Motion for Summary Judgment (Doc. No. 24) ("Defendant's MSJ").[1] As explained below, the Court finds that Pohlabel is entitled to summary judgment. There is no genuine issue as to any material fact, and Pohlabel is entitled to a judgment as a matter of law concerning the three alleged constitutional violations. Therefore, the Court **GRANTS** Defendant's MSJ, **DENIES** Plaintiff's MSJ, and **TERMINATES** this case.

---

[1] Pohlabel is the only remaining defendant in this case. On November 8, 2021, the Court entered an order granting a joint motion to drop Jason Barhorst ("Barhorst") as a party-defendant. (Doc. No. 20.)

## I.  **BACKGROUND** [2]

### A.  **The Stop**

During the early afternoon of November 13, 2019, Collik was driving a vehicle eastbound on Interstate 70 in Preble County, Ohio.  (Doc. No. 23 at PageID 112-13.)  At that time, trooper Pohlabel was in his patrol cruiser, parked in the median and conducting speed monitoring.  (*Id.*)  Pohlabel observed Collik's vehicle—a limousine with windows tinted out except for the front windows and windshield—approach him on the interstate and slow down without braking, with Collik leaning forward over the steering wheel while looking away as he passed Pohlabel.  (*Id.*)  Although Collik had not committed any traffic offense, Pohlabel decided to pursue Collik to run the vehicle's tag.  (*Id.* at PageID 123.)

Claiming that he then observed Collik commit a marked lanes violation (traffic infraction), Pohlabel decided to make a traffic stop.  (Doc. No. 23 at PageID 124.)  The video from Pohlabel's dashboard camera does not show that Collik's tires crossed the white edge line (i.e., the fog line); instead, it shows that Collik's vehicle merely drove on that line.  (Video[3] at 12:47:11 – 12:47:19; *see also* Doc. No. 21 at PageID 75 (Collik asserting that "the tire, at best, touched the edge line but was never outside any portion thereof").)  Pohlabel initiated a traffic stop by pulling behind Collik's vehicle and activating the light bar on his cruiser.  (Video at 12:47:23 – 12:47:35.)  Pohlabel followed behind Collik's vehicle with his light bar activated for approximately one mile before Collik finally pulled over onto the shoulder and stopped.  (*Id.* at 12:47:35 – 12:48:48.)  During the time that Pohlabel was behind Collik's vehicle with his light bar activated, the vehicle

---

[2] The recitation in the "Background" section includes undisputed facts and otherwise assumes the evidence of the non-moving party (here, Collik, for purposes of Defendant's MSJ, which resolves the case), as true and draws all reasonable inferences in the non-moving party's favor, as is appropriate at this stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

[3] The parties manually filed a disc containing the dashboard camera video.  (*See* Doc. Nos. 27, 28, and 29.)  Specific time references in this order are based on the time of day indicated at the top of the video image (hour:minute:second).

in front of Collik pulled over, yet Collik continued driving. (*Id.* at 12:48:13 – 12:48:18.)

### B. Post-Stop

Once their vehicles were stopped on the side of the busy interstate, Pohlabel instructed Collik to exit his vehicle and come towards him. (Video at 12:48:50 – 12:49:12.) Collik exited his vehicle, Pohlabel asked Collik why he did not pull over once Pohlabel's light bar was activated, and Pohlabel asked if there was anyone else in Collik's vehicle. (*Id.* at 12:49:12 – 12:50:12.) Pohlabel then asked Collik if he could pat him down, Collik consented, Pohlabel conducted a pat-down, and Pohlabel asked Collik about his identification, registration, and insurance. (*Id.* at 12:50:12 – 12:50:54.) Pohlabel then told Collik that he was going to bring him into his cruiser because it was so cold outside (to which Collik said "Yeah") and that he didn't want them to get hit on the busy road, so both men got situated in Pohlabel's cruiser. (*Id.* at 12:50:54 – 12:52:13.) At that point, Pohlabel asked Collik how long he had been driving; Collik indicated that he was driving across the country and discussed his trip—including how he was driving to New York but lives in Colorado. (*Id.* at 12:52:13 – 12:52:55.) Pohlabel then explained to Collik why he pulled him over, including wanting to make sure that Collik was not falling asleep; Collik told Pohlabel that he had been driving a lot and how much he had been sleeping, and Collik volunteered some details of the route he had taken—including that his trip actually started in Las Vegas and that this was the first time he had been pulled over. (*Id.* at 12:52:55 – 12:55:19.) Pohlabel then asked Collik if the limousine belonged to him and about some visible damage on it, Pohlabel pointed out that the entire rear end of the vehicle appeared to be weighted down, and Collik provided an explanation for the sagging. (*Id.* at 12:55:19 – 12:56:36.) Pohlabel then asked how long Collik would be in New York; Collik said that he was "not sure, maybe like a few weeks"; Pohlabel asked if Collik had a job; and Collik explained that he lost his job, since that time he had been trying to find something new, and he wasn't planning on looking for a new job in New York but instead

would most likely "head back to the West Coast at some point and get a job out there." (*Id.* at 12:56:36 – 12:57:22.)

Pohlabel testified that, at this point in the stop, based on everything that had led up to that point, he believed there was criminal activity going on (specifically, transporting narcotics). (Doc. No. 23 at PageID 154-55, 157.) So, he called another trooper who was nearby (Barhorst) to bring a canine unit to the location. (*Id.* at PageID 160; Video at 12:57:21 – 12:57:24.) Pohlabel then continued pursuing the marked lanes violation—asking Collik about his Colorado driver's license number, calling information into dispatch, asking Collik about his address, waiting for information from dispatch, looking for his warning slips, asking Collik about the year of his vehicle, and filling out the warning slip—while also talking with Collik. (Video at 12:57:45 – 13:03:33; Doc. No. 23 at PageID 179, 181-184.) During this time, Barhorst arrived, his canine conducted a free air sniff of Collik's vehicle, and the canine alerted. (*Id.*) The officers then searched Collik's vehicle (including its trunk), which resulted in Collik being detained for a total duration of over an hour. (Video at 13:03:33 – 14:05:40.)

### C. Complaint and Current Motions

On July 27, 2020, Collik filed his complaint in this case, alleging deprivation of civil rights under 42 U.S.C. § 1983 ("Section 1983"). (Doc. No. 1.) In the Complaint, Collik asserts three violations of his constitutional rights. (*Id.* at PageID 7-9.) First, that the initial traffic stop violated his constitutional rights under the Fourth and Fourteenth Amendments because Pohlabel "lacked a particularized and objective basis for suspecting [him] of criminal activity or violation of a traffic law." (*Id.*) Second, that Pohlabel violated Collik's constitutional rights under the Fourth and Fourteenth Amendments by exceeding the time needed to handle the matter for which the traffic stop was made. (*Id.*) Third, that Pohlabel violated Collik's constitutional rights under the Fourth and Fourteenth Amendments because searching the trunk of Collik's vehicle exceeded the scope

4

of any probable cause that Pohlabel had to search Collik's vehicle. (*Id.*)

On November 12, 2021, Plaintiff's MSJ and Defendant's MSJ were filed. (Doc. Nos. 21 and 24.) On December 3, 2021, the parties each filed a response in opposition to the other party's motion. (Doc. Nos. 30 and 31.) On December 17, 2021, Pohlabel filed a reply in support of Defendant's MSJ. (Doc. No. 32.) Collik did not file a reply in support of Plaintiff's MSJ, and the time to do so has now passed. S.D. Ohio Civ. R. 7.2(a)(2). Plaintiff's MSJ and Defendant's MSJ are ripe for review.

## II.   LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It also is not sufficient to "simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

Finally, "where, as here, there is a videotape capturing the events in question, the court must view the facts in the light depicted by the videotape." *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (internal quotation marks omitted and alterations adopted).

### III.   ANALYSIS

Courts separately analyze "allegations of Fourth Amendment violations … for each search or seizure that is alleged to be unconstitutional." *Carter v. Hamaoui*, 699 F. App'x 519, 532 (6th Cir. 2017) (internal quotation marks omitted).  In Plaintiff's MSJ, Collik "moves for the entry of partial summary judgment in his favor" concerning both the initial stop and the time needed to handle the matter for which the traffic stop was made.  (Doc. No. 21 at PageID 71.)  Thus, Collik moves for summary judgment on the first two constitutional violations alleged in his Complaint, but not the third alleged constitutional violation.  (*Id.*; Doc. No. 1 at PageID 7-9.)  He argues that there is "no genuine dispute of material facts and said undisputed facts establish the infringement of [his] rights … under the Fourth and Fourteenth Amendments to the United States Constitution." (Doc. No. 21 at PageID 71.)

Pohlabel argues that he is entitled to qualified immunity.  (Doc. No. 24 at PageID 204.) He contends that "the undisputed facts show that Trp. Pohlabel violated none of Plaintiff's constitutional rights."  (*Id.*)  He also argues that, "even if Plaintiff could show some possible constitutional violation, Trp. Pohlabel would still be entitled to judgment because he did not violate clearly established law."  (*Id.* at PageID 204-05.)

Neither party argues that there is any genuine issue of material fact, with one exception. Collik argues that "at a minimum, a comparison between the video and the testimony of [Pohlabel] establishes a dispute as to whether [Collik] actually committed a marked lane violation to support the initiation of the traffic stop."  (Doc. No. 21 at PageID 75.)  As shown below, this actually is a dispute concerning the law, not the facts.  Regardless, not only does the Court assume the truth of Collik's supporting evidence (as reflected in the Background section, above), but the Court agrees that the video shows that Collik's vehicle only drove on—and did not cross—the marked lane (*see* Video at 12:47:11 – 12:47:19).  *Anderson*, 477 U.S. at 255; *Green*, 681 F.3d at 859.  Ultimately,

7

the Court finds that there is no genuine issue as to any material fact and Pohlabel is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

### A.  **The Initial Stop**

Collik first argues that "there was not a sufficient legal basis to effectuate the traffic stop, *i.e.*, the seizure of" Collik because his entire tire did not cross the marked lane line.  (Doc. No. 21 at PageID 73-78; Doc. No. 30 at PageID 319-23.)  Pohlabel counters by arguing that he had probable cause to stop Collik's vehicle and that, even if he did not, he is still entitled to qualified immunity because he did not violate clearly established law.  (Doc. No. 24 at PageID 204-05, 210; Doc. 31 at PageID 328.)

### (1) <u>Section 1983 and qualified immunity</u>

As mentioned above, Collik brings his claim pursuant to Section 1983.  Section 1983 "provides a cause of action for deprivation, under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States."  *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 656 (6th Cir. 1994).[4]  To succeed on a Section 1983 claim, the plaintiff must establish both that (1) he or she was deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was caused by a person acting under color of state law.  *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001); *Green*, 681 F.3d at 859-60.

However, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555

---

[4]  Section 1983 states:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. … "

U.S. 223, 231 (2009) (internal quotation marks omitted). "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability." *Id.* (internal quotation marks omitted). The "plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). A court may "address these requirements in either order," and, "[i]f one is lacking," then the court "need not address the other." *Crawford*, 15 F.4th at 760.

Regarding the second requirement, the Supreme Court has emphasized that "clearly established law" "should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). Instead, "the clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks omitted). And, "'[c]learly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (internal citation and quotation marks omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (internal quotation marks omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). If judges disagree on a constitutional question, then "it is unfair to subject police to money damages for picking the losing side of the controversy." *Pearson*, 555 U.S. at 245. "Police officers are entitled to rely on existing

lower court cases without facing personal liability for their actions." *Id.* at 244-45.

### (2) Marked lines violation law

"The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects,' including vehicles, 'against unreasonable searches and seizures.'" *United States v. Snoddy*, 976 F.3d 630, 633 (6th Cir. 2020) (quoting U.S. CONST. amend. IV). "The Fourteenth Amendment incorporates the Fourth Amendment, prohibiting unreasonable searches and seizures by the states." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994). "An officer may stop and detain a motorist without contravening the Fourth Amendment's prohibition against unreasonable searches and seizures so long as the officer has probable cause to believe that the motorist has violated a traffic law." *Green*, 681 F.3d at 860 (internal quotation marks omitted). The focus is on "whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Id.* at 392. "Probable cause is a flexible, common-sense standard." *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)); *see also United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (the requirement of probable cause is satisfied where the facts and circumstances within the officer's knowledge and of which he or she had reasonable trustworthy information are sufficient to demonstrate that an offense has been or is being committed).

As referenced above, Pohlabel based his traffic stop of Collik's vehicle on an alleged marked lanes violation. (*See* Doc. No. 21 at PageID 72.) Ohio Rev. Code § 4511.33, titled "Rules for driving in marked lanes," is part of Ohio's traffic laws. Subsection (A)(1) of that statute states, in relevant part:

> Whenever any roadway has been divided into two or more clearly

> marked lanes for traffic … [a] vehicle … shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.

Ohio Rev. Code § 4511.33(A)(1).

About a month-and-a-half before Pohlabel stopped Collik's vehicle, Ohio's Twelfth District Court of Appeals, interpreting this statute, had held that "a motor vehicle is required to travel fully inside the marked lanes," and "[d]riving on a marked lane is not fully inside or 'entirely within' a single lane of traffic." *State v. Turner*, 145 N.E.3d 985, 2019-Ohio-3950, at ¶ 19 (Ohio Ct. App. 2019). Therefore, according to that appeals court, "an officer who observes a motorist driving on a marked lane line has reasonable and articulable suspicion that the driver has violated [Ohio Rev. Code §] 4511.33 and may conduct a traffic stop." *Id.* (emphasis added). At the time, a number of other Ohio district courts of appeals had held the opposite, i.e., that a motorist driving on a marked lane line has not violated Ohio Rev. Code. § 4511.33 and only violates the statute when the vehicle's tires cross the marked lane line completely. *See, e.g., State v. Smith*, 94 N.E.3d 1058, 2017-Ohio-5845, at ¶ 25 (Ohio's Third District Court of Appeals holding that an officer lacked reasonable, articulable suspicion to stop a vehicle for driving on top of, but not across, the white line); *State v. Parker*, 2013 WL 4041582, 2013-Ohio-3470, at ¶¶ 7, 10 (Ohio Ct. App. 2013) (Ohio's Sixth District Court of Appeals holding that a motorist does not commit a marked-lanes violation by traveling on the fog line); *see also State v. Turner*, 163 Ohio St. 3d 421, 170 N.E.3d 842, 2020-Ohio-6773, at ¶¶ 9, 11 (Ohio 2020) (Supreme Court of Ohio explaining that the Twelfth District's determination "reject[ed] the holdings of [the other] courts of appeals that had determined that merely touching the lane line did not violate" the statute).[5] In fact, the Twelfth

---

[5] Collik also cites to *United States v. Warfield*, 727 F. App'x 182, 186 (6th Cir. 2018), a federal Sixth Circuit Court of Appeals opinion issued on April 13, 2018—therefore prior to Ohio's Twelfth District Court of Appeals' opinion in *Turner*—that had relied on some of those other Ohio district courts of appeals decisions (Doc. No. 21 at PageID 76).

District certified a conflict on the issue for the Ohio Supreme Court to resolve and, shortly thereafter, the Ohio Supreme Court agreed that a conflict existed and ordered the parties to brief the issue. *State v. Turner*, 157 Ohio St. 3d 1544, 137 N.E.3d 1225 (Table), 2020-Ohio-94 (Ohio Jan. 22, 2020); *Turner*, 2020-Ohio-6773, at ¶ 1 (explaining that the case had been "accepted as a certified conflict between judgments of the Twelfth District and [several other] District Courts of Appeals" in Ohio).

It was not until December 22, 2020 (more than a year after Pohlabel stopped Collik's vehicle) that the Supreme Court of Ohio issued its ruling in the *Turner* case. *Turner*, 2020-Ohio-6773, at ¶¶ 1, 3 (resolving the conflict by holding that Ohio Rev. Code. § 4511.33(A)(1) does not prohibit driving on or touching the fog line; reversing the judgment of Ohio's Twelfth District Court of Appeals). Therefore, between September 30, 2019 (when the Twelfth District Court of Appeals issued its decision) and December 22, 2020 (when the Supreme Court of Ohio issued its decision), conflicting legal decisions existed on the issue of whether "a vehicle's driving on or touching the fog line" violated Ohio Rev. Code. § 4511.33(A)(1).[6] *Id.*; *see also McFadden v. Cleveland State Univ.*, 120 Ohio St. 3d 54, 896 N.E.2d 672, 2008-Ohio-4914, at ¶15 ("all court of appeals decisions are applicable precedent unless and until they are formally overruled"); Ohio S.Ct.R.Rep.Op. 3.4 ("[a]ll opinions of the courts of appeals issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts without regard to whether the opinion was published or in what form it was published").

---

*See Dewine v. State Farm Ins. Co.*, 163 N.E.3d 614, 2020-Ohio-5517, at ¶ 26 (Ohio Ct. App. 2020) (explaining that Ohio courts are not bound by the decision of a federal court other than the United States Supreme Court).

[6] The stop at issue here took place in a county within the judicial district served by Ohio's Twelfth District Court of Appeals. *See* https://www.supremecourt.ohio.gov/JudSystem/districtCourts/ (last visited February 7, 2022); https://www.supremecourt.ohio.gov/JudSystem/districtCourts/district12/default.asp (last visited February 7, 2022) (Preble County is located within the judicial district of Ohio's Twelfth District Court of Appeals).

**(3) <u>Pohlabel is entitled to qualified immunity concerning the initial stop</u>**

In accordance with the principles set forth above, to overcome Pohlabel's qualified immunity defense, Collik must establish that the traffic stop violated one of his constitutional rights and that the unlawfulness in doing so was clearly established at the time of the traffic stop. The Court finds that he has not and cannot do so.

Even if the traffic stop here was unconstitutional (an issue that, as set forth above, the Court need not and does not specifically address), Pohlabel is entitled to qualified immunity concerning the initial stop because its (presumed) unlawful nature was not clearly established at the time. *Pearson*, 555 U.S. at 232, 243-45 (police officers were entitled to qualified immunity on Section 1983 claims because it was not clearly established that their conduct was unlawful at the time). At the time Pohlabel stopped Collik's vehicle, Ohio's Twelfth District Court of Appeals—whose appellate district includes Preble County, where the stop took place—had recently ruled that driving on the fog line <u>violated</u> the law. *Turner*, 2019-Ohio-3950, at ¶ 19. And, that appeals court flagged for the Ohio Supreme Court that other appellate courts in Ohio had ruled the opposite way. *Turner*, 2020-Ohio-6773, at ¶ 1.

Therefore, at the time of the stop at issue here, judges disagreed (and the Ohio Supreme Court had not yet ruled) on whether simply driving on a marked lane line violated Ohio Rev. Code. § 4511.33(A)(1), such that the driver could be stopped and issued a traffic citation for doing so. *Wesby*, 138 S. Ct. at 589-90; *Pearson*, 555 U.S. at 245. The law was not "sufficiently clear" and existing law failed to place "the constitutionality of the officer's conduct beyond dispute." *Wesby*, 138 S. Ct. at 589-90. Accordingly, Pohlabel is entitled to qualified immunity regarding Collik's assertion that the initial stop violated his Constitutional rights.[7] *Wesby*, 138 S. Ct. at 589;

---

[7] The Court therefore does not need to address the parties' arguments concerning Pohlabel's additional contention regarding the initial stop, <u>i.e.</u>, that he witnessed Collik's vehicle violate Ohio Rev. Code § 4511.34 (space between

*Crawford*, 15 F.4th at 760.

Collik argues that, "[i]n terms of effectuating a warrantless seizure at the time [Pohlabel] effectuated a traffic stop of [Collik], it was clearly-established that an officer needs either probable cause or reasonable suspicion to conduct a traffic stop." (Doc. No. 30 at PageID 320 (internal quotation marks omitted).) However, Collik's argument is not "particularized to the facts of the case." *White*, 137 S. Ct. at 552. It was not "clearly established" at the time of the traffic stop that Collik's action (driving on the marked lane line) did not violate a traffic law and, thus, that it did not provide an officer with the necessary probable cause or reasonable suspicion to make the stop. Again, at the time, Ohio's Twelfth District Court of Appeals had recently ruled that Collik's action did violate a traffic law and, therefore, permitted an officer to make a traffic stop. *Turner*, 2019-Ohio-3950, at ¶ 19 (Ohio Ct. App. 2019) ("an officer who observes a motorist driving on a marked lane line has reasonable and articulable suspicion that the driver has violated [Ohio Rev. Code §] 4511.33 and may conduct a traffic stop") (emphasis added); *see also Green*, 681 F.3d at 860 ("[a]n officer may stop and detain a motorist without contravening the Fourth Amendment's prohibition against unreasonable searches and seizures so long as the officer has probable cause to believe that the motorist has violated a traffic law") (internal quotation marks omitted). And, it was not until the Ohio Supreme Court resolved the conflict between the Twelfth District Court of Appeals' decision in *Turner* and decisions from other Ohio courts of appeals that it became clearly established that Collik's action was not a traffic infraction and, thus, was insufficient to provide an officer with probable cause to conduct a traffic stop. The Ohio Supreme Court did not resolve that conflict until December 22, 2020—well over a year after the stop here. *Turner*, 2020-Ohio-6773. Collik never addresses *Turner* and its implications. (*See* Doc. Nos. 21, 30.)

---

moving vehicles). (Doc. No. 24 at PageID 210; Doc. No. 30 at PageID 321-23.)

### B.  Duration of Traffic Stop

Collik next argues that Pohlabel "unduly extend[ed] the length of the traffic stop in order to await the arrival of a drug-sniffing canine," in violation of "the legal standard as established by the Supreme Court in *Rodriguez*."  (Doc. No. 21 at PageID 78.)  Collik asserts that there was an "extended initial interaction between" Pohlabel and Collik that was "not related to the claimed reason for the traffic stop."  (Doc. No. 30 at PageID 325.)  Pohlabel responds by arguing that he was pursuing the traffic stop until the canine alerted to the presence of narcotics and that, "[e]ven if the stop was extended beyond the purpose of the original stop, Trp. Pohlabel had reasonable and articulable suspicion to do so" because the circumstances then presented were sufficient to support reasonable suspicion that Collik was transporting illegal narcotics in violation of Ohio Rev. Code § 2925.03.  (Doc. No. 24 at PageID 209, 212, 216.)  Collik responds to Pohlabel's latter argument by contending that "there was no legitimate reasonable suspicion on the part of [Pohlabel] to further extend the traffic stop … and await the summoning of a drug-sniffing canine."  (Doc. No. 21 at PageID 81-86; Doc. No. 30 at PageID 325-26.)

### (1)  Legal principles concerning detaining someone during a traffic stop

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  The Supreme Court in *Rodriguez v. United States*, 575 U.S. 348 (2015) laid out the law concerning a traffic stop's permissible duration and investigations unrelated to the traffic stop:

> A seizure for a traffic violation justifies a police investigation of that violation.  A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest.  Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns.  Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. …

> "[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention. … [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. … The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But … he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Rodriguez*, 575 U.S. at 354-55 (internal citations and quotation marks omitted); *see also Johnson*, 555 U.S. at 333 ("[a]n officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not <u>measurably extend</u> the duration of the stop") (emphasis added). The Sixth Circuit defined "measurable" in the context of traffic stops as "significant" or "great enough to be worth consideration." *United States v. Everett*, 601 F.3d 484, 491 (6th Cir. 2010); *see also United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) ("[a] traffic stop is not 'measurably' extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree").

The Court in *Rodriguez* also discussed what may be necessary to "complete the mission of issuing a warning ticket":

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez*, 575 U.S. at 355; *see also United States v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009) ("[w]aiting for the results of the license check was clearly within the purpose of the initial stop" and "any time that the [o]fficers spent in pursuing other matters while the background check was processing, even if those matters were unrelated to the original purpose of the stop, did not extend the length of the stop"). The Supreme Court also recognized that an officer's "safety interest stems

from the mission of the stop itself." *Rodriguez*, 575 U.S. at 356. Thus, certain tasks related to officer safety—such as requiring a driver, who is lawfully stopped, to exit the vehicle—are related to completing the stop's mission. *Id.* ("an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely"); *see also United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) ("during a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop," without "need[ing] independent justification"); *Johnson*, 555 U.S. at 330-31 ("traffic stops are especially fraught with danger to police officers" and "a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver might be armed and presently dangerous") (internal quotation marks omitted). Additionally, "certain locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as the motorist's travel history and travel plans and the driver's authority to operate the vehicle … may help explain, or put into context, why the motorist was committing the suspicious behavior the officer observed." *Everett*, 601 F.3d at 494 (determining that the officer's questioning did not render the traffic stop an unreasonable seizure); *see also United States v. Martinez*, 413 F. Supp. 3d 714, 724 (N.D. Ohio 2019) (explaining that "basic questions relating to [the motorist's] identity, travel plans, and reason for being in Ohio," as well as "how long he had been driving," were all "initial information gathering questions … related to the mission of the stop and, therefore, [could not] have unduly prolonged it").

However, conducting a dog sniff is not properly characterized as part of the officer's traffic mission. *Rodriguez*, 575 U.S. at 355-57. Also, "[o]n-scene investigation into other crimes … detours from that mission," as "do safety precautions taken in order to facilitate such detours." *Id.* at 356; *see also Everett*, 601 F.3d at 495 (contrasting locomotion-related and officer safety inquiries with situations where "questions unrelated to the traffic violation constituted the bulk of

17

the interaction between the trooper and the motorist" or where "the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation"). In the context of a dog sniff, "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket … but whether conducting the sniff prolongs—*i.e.*, adds time to—the stop." *Rodriguez*, 575 U.S. at 357 (internal citation and quotation marks omitted); *see also Carter*, 699 F. App'x at 532 (finding no evidence that officer's action prolonged the stop to conduct a dog sniff).

Yet, as referenced above, an officer may extend a seizure "if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (emphasis in original; internal quotation marks omitted); *see also Rodriguez*, 575 U.S. at 355. Thus, "[o]nce a stop begins, detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct." *Green*, 681 F.3d at 860 (internal quotation marks omitted and alteration adopted). More specifically, officers may "extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity." *United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020).

"Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch." *Green*, 681 F.3d at 860. "It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *Id.* (internal quotation marks omitted). "In determining whether reasonable suspicion existed, [courts] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Carter*, 699 F. App'x at 525 (internal quotation

marks omitted).  "The totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 525-26.  Courts "must examine objectively the facts [the officer] observed and determine whether they are sufficient to provide reasonable suspicion of a violation of the laws." *Id.* at 527.  This "totality-of-the-circumstances inquiry" looks to whether individual factors, taken as a whole, gave "rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Green*, 681 F.3d at 860-61 (internal quotation marks omitted).  There is "no magic numerosity of facts, a minimum of which must be gleaned in sifting the circumstances in order to total up and justify" a determination that reasonable suspicion existed; reasonable suspicion has been found where "very few relevant facts existed" and has "been found lacking although quite a number of facts are pointed out."  *United States v. Shank*, 543 F.3d 309, 317 (6th Cir. 2008).

### (2) Pohlabel is entitled to qualified immunity concerning the stop's duration

Collik has not met the first requirement to overcome qualified immunity on this issue. *Wesby*, 138 S. Ct. at 589.  He has not shown that Pohlabel violated his constitutional rights because of the traffic stop's duration.  More specifically, the video demonstrates that Pohlabel did not extend the stop longer than necessary to effectuate the stop's purpose before he had reasonable suspicion to justify further detaining Collik to conduct a dog sniff (which resulted in the dog alerting to the presence of drugs in Collik's vehicle).  Collik acknowledges that the purpose of the traffic stop "was to ensure [Collik] was not falling asleep," as well as to determine whether to issue a traffic ticket.  (Doc. No. 21 at PageID 78.)  The undisputed evidence demonstrates that the few moments that Pohlabel made inquiries unrelated to the stop's mission (and that occurred prior to him having reasonable suspicion that Collik was trafficking contraband) did not prolong the stop

"beyond the time reasonably required to complete the mission." *Rodriguez*, 575 U.S. at 354-55.

In analyzing the stop here, much of the alleged "extended initial interaction" between Pohlabel and Collik (Doc. No. 30 at PageID 325) in fact falls within the permissible confines of *Rodriguez* for completing the stop's mission or related officer safety concerns. This includes, for example, ordering Collik out of the vehicle, asking if there was anyone else in the vehicle, engaging in a consensual pat-down, asking about Collik's identification, registration, and insurance, and placing Collik in the cruiser (without protest from Collik because it was cold and they were on a busy highway). It also includes discussion related to Collik's identity, how long he had been driving, his travel history, his travel plans, his authority to operate the vehicle, and why Collik was pulled over—all of which constitute "ordinary inquiries incident to the traffic stop" and/or inquiries for completing the mission of ensuring that Collik was not falling asleep (which also serves the purpose of "ensuring that vehicles on the road are operated safely and responsibly"). *Rodriguez*, 575 U.S. at 354-55; *see also Everett*, 601 F.3d at 494; *Martinez*, 413 F. Supp. 3d at 724.

Pohlabel admits that "not all" of his "questions to [Collik] during the time that he was gathering and running [Collik's] information and working on completing the written warning may have been directly relevant to the initial stop and the marked lanes violation." (Doc. No. 24 at PageID 214.) The Court agrees that some were not, including some that were asked prior to the time when he had reasonable suspicion that Collik was trafficking in contraband. For example, inquiries regarding how long Collik would be in New York and whether Collik had a job were unrelated investigations. (Video at 12:56:36 – 12:57:22.) However, Pohlabel's inquiries into unrelated matters did not impermissibly prolong the stop "beyond the time reasonably required to complete" its mission. *Rodriguez*, 575 U.S. at 354-55. In other words, the reasonable suspicion

20

arose within the permissible duration of the initial stop because any earlier time spent on unrelated investigations was far shorter than the amount of time reasonably necessary to complete the remaining tasks tied to the traffic infraction. *See Lott*, 954 F.3d at 924 (the circumstances that provide reasonable suspicion to prolong the stop "must have occurred within the permissible duration of the stop for the subsequent search [based on that reasonable suspicion] to be constitutional"). The video shows that any time spent conducting unrelated investigations (prior to when Pohlabel had reasonable suspicion to believe that criminal activity was afoot and called for the canine unit) was significantly less than the amount of time that Pohlabel then spent in his continued pursuit of the marked lanes violation (i.e., asking Collik about his Colorado driver's license number, calling information into dispatch, asking Collik about his address, waiting for information from dispatch, looking for his warning slips, asking Collik about the year of his vehicle, and filling out the warning slip). (Video at 12:57:45 – 13:03:33; Doc. No. 23 at PageID 179, 181-184.) In short, the video demonstrates that reasonable suspicion existed prior to the time when the "tasks tied to the traffic infraction … reasonably should have been" completed. *Rodriguez*, 575 U.S. at 354-55.

Pohlabel points to several things he observed, prior to calling Barhorst for the canine unit, that he argues were more than sufficient to provide reasonable suspicion of criminal activity. Before initiating the traffic stop, Collik was hunched forward against the steering wheel while appearing to avoid looking in Pohlabel's direction while passing him. Collik drove for nearly a mile while Pohlabel was behind him with the light bar on his patrol vehicle activated. *See United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008) (affirming determination that officer had reasonable suspicion that motorist was engaged in criminal activity, where one of the factors considered was "failure of the vehicle to pull over once [the officer] activated his lights"). Collik

21

told Pohlabel that he was traveling from Colorado to New York and had actually started his trip in Las Vegas; Pohlabel testified that Colorado and Nevada are known source states for narcotics and New York is a known distribution state (Doc. No. 23 at PageID 144-45). *See Salas*, 820 F. App'x at 413 (affirming determination that officer had reasonable suspicion that motorist and passenger were transporting illegal drugs and that the dog sniff was constitutional on that basis, where one of the factors considered was "travel from drug-source states" identified by the officer). Pohlabel also pointed out to Collik that the entire rear end of his vehicle appeared to be weighted down. *See United States v. Briasco*, 640 F.3d 857, 859-60 (8th Cir. 2011) (affirming determination that officer had reasonable suspicion that motorist was transporting illegal drugs and therefore could detain him until a drug search could be conducted, where one of the factors considered was "the sagging or squatting of the back end of the vehicle"); *United States v. Meyer*, 20 F. App'x 808, 815-16 (10th Cir. 2001) ("the fact that the car appeared to be heavily loaded can contribute to a reasonable suspicion" that the motorist is transporting illegal drugs). Additionally, Collik was driving a limousine across the country, while unemployed, and he told Pohlabel that he did not plan on looking for a job in New York but instead would most likely head back to the West Coast at some point (Doc. No. 23 at PageID 112, 155, 157; Video at 12:56:36 – 12:57:22). *See United States v. Ahmad*, No. 18-30059, 2019 U.S. Dist. LEXIS 88254, 2019 WL 2241663, at *4 (C.D. Ill. May 24, 2019) (explaining that, while there is nothing extraordinary about driving across the country, most police officers would find the motorists' travel account—flying from Houston, Texas to Idaho to rent an RV then drive to Columbus, Ohio—to possibly suggest criminal activity). Certainly, by itself, this fact is entirely consistent with innocent behavior and would be insufficient on its own to raise reasonable suspicion. In fact, none of these facts, in isolation, likely would rise to the level of providing reasonable suspicion. However, that is not how such facts are assessed; they are

22

looked at as a whole, in a totality-of-the-circumstances analysis. *Green*, 681 F.3d at 860-61; *United States v. Winters*, 782 F.3d 289, 301 (6th Cir. 2015) (courts should not engage in a "divide-and-conquer analysis" that examines the factors supporting reasonable suspicion in isolation from each other).

Collik argues that these facts—none of which are disputed—are nothing more than Pohlabel's "attempt[] to characterize innocent behavior as giving rise to suspicion in order to justify the continued detention of" Collik. (Doc. No. 30 at PageID 326.) The Court disagrees and finds that these specific and articulable facts (and the rational inferences from them) were more than sufficient to provide Pohlabel with the reasonable suspicion necessary.[8] *Green*, 681 F.3d at 860; *Carter*, 699 F. App'x at 525.

In summary, the initial traffic stop provided Pohlabel with the authority to seize Collik up to the time he had reasonable suspicion to believe that there was other criminal activity (namely, drug trafficking), then the reasonable suspicion provided Pohlabel with the authority to continue detaining Collik until he could conduct a reasonable investigation concerning that suspected wrongdoing. *See Winters*, 782 F.3d at 303 (sufficient facts were presented to find that a reasonable officer would have reasonable suspicion of trafficking contraband, "which justified a reasonable investigation to uncover that activity"). "Deploying the drug-detection dog … was a reasonable

---

[8] In support of his arguments, Collik cites *United States v. Yang*, 432 F. Supp. 3d 957 (D.N.D. 2020), an out-of-circuit report and recommendation issued by a magistrate judge. (Doc. No. 21 at PageID 82.) The circumstances presented in that case are distinguishable. In *Yang*, the magistrate judge opined that the prosecution had not proven reasonable suspicion of other criminal activity sufficient to detain the defendant at the time that he requested a canine trooper where the defendant had merely slowed down when observing the patrol vehicle, driven in a "rigid" manner, and failed to look at the officer when he "paralleled the vehicle." *Yang*, 432 F. Supp. 3d at 978. The magistrate judge also did not view the information the officer subsequently "gained during the 8 ½ minutes he questioned [the defendant] prior to the arrival of the canine trooper"—namely, that the defendant chose to travel through North Dakota without her children and exhibited signs of nervousness—as constituting reasonable suspicion. *Id.* Another case relied on by Collik, *United States v. Townsend*, 138 F. Supp. 2d 968 (S.D. Ohio 2000), is similarly distinguishable because Pohlabel had different and additional grounds for reasonable suspicion not presented to the officer in that case, including how Collik drove for approximately a mile despite Pohlabel's cruiser driving behind him with the lights activated, Collik indicated that he was unemployed and his plans included traveling back and forth across the country in a limousine, and the rear end of Collik's vehicle was sagging and appeared to be weighed down.

means of investigating that suspected illicit activity." *Id.* (holding that "there was reasonable suspicion to justify the extended detention of [motorist] and that the dog-sniff inspection was a reasonable means to dispel that suspicion").

Pohlabel is entitled to qualified immunity concerning the alleged constitutional violation of exceeding the time needed to handle the matter for which the traffic stop was made. *See Wesby*, 138 S. Ct. at 589; *Tomas-Pedro v. Holden*, No. 3:18-cv-1136, --- F. Supp. 3d ---, 2021 U.S. Dist. LEXIS 174917, 2021 WL 4198174, at *11 (N.D. Ohio Sept. 15, 2021) (finding insufficient evidence upon which a jury could reasonably find that defendant officer unconstitutionally prolonged the traffic stop and, therefore, granting officer summary judgment on Section 1983 claim).

### C.  Search of the Trunk

Finally, Pohlabel argues that, because the drug-sniffing canine alerted to the presence of narcotics in Collik's vehicle, he had the right to search the entire vehicle and, therefore, he did not violate Collik's constitutional rights by searching the vehicle's trunk. (Doc. No. 24 at PageID 217-18.) Collik never addresses the argument. (*See* Doc. Nos. 21 and 30; *see also* Doc. No. 30 at PageID 321 (indicating that there are only "two constitutional issues in this case").) Both for that reason and because the law supports Pohlabel's argument, Pohlabel is entitled to summary judgment regarding the third alleged constitutional violation.

"The general rule is that warrantless searches of vehicles are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Snoddy*, 976 F.3d at 633 (internal quotation marks omitted). One such exception is the automobile exception, which "permits officers to search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019). "An alert to the presence of drugs by a properly

trained narcotics detection dog is sufficient to establish probable cause to search a vehicle." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012); *see also United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) ("before the dog alerted on the car, probable cause for a search did not exist," but "[a] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance"). Additionally, the Sixth Circuit has held: "[i]f the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden," and that an alert by a properly trained and reliable drug-detection dog gives "officers probable cause to search [a] car and any containers capable of hiding drugs." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012); *see also United States v. Kelley*, 459 F. App'x 527, 532 (6th Cir. 2012) ("Sixth Circuit case law clearly demonstrates that the search of an entire car for drugs after a drug-dog's alert is reasonable," including a search of the car's trunk).

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Defendant Pohlabel's Motion for Summary Judgment (Doc. No. 24) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 21). The Court finds that, after construing the evidence and all inferences most favorably to Collik, there is no genuine issue of material fact and Pohlabel is entitled to judgment as a matter of law. This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, February 15, 2022.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE